In the Matter of Ronald E. BRUNO, Debtor.

Bankruptcy No. 86–01558–3.

United States Bankruptcy Court, W.D. Missouri, W.D.

Sept. 12, 1986.

Ralph A. Monaco II, Thayer, Bernstein & Bass, Kansas City, Mo., for debtor.

ORDER DISMISSING CHAPTER 7 PROCEEDINGS AS A "SUBSTANTIAL ABUSE" OF THAT CHAPTER WITHIN THE MEANING OF § 707(b) OF THE BANKRUPTCY CODE

DENNIS J. STEWART, Chief Judge.

The debtor in these chapter 7 proceedings was recently convicted in the Circuit Court of Jackson County, Missouri, of the second degree murder of his wife, Joyce Bruno. He has filed in the bankruptcy court a petition for relief under chapter 7 of the Bankruptcy Code in which, in substance, he seeks to discharge his liability for her funeral bills. In his petition, which was filed in this court on April 3, 1986, he schedules secured creditors with respect to a house and a "1985 Blazer," but he proposes to reaffirm those indebtednesses. The unsecured indebtedness scheduled are composed of (1) loans made to the debtor by his parents and grandparents for bond money and attorney's fees in connection with the state court criminal proceedings totaling $18,000; (2) miscellaneous small consumer debts for a stereo ($974.74), encyclopedias ($886.94), and other purchases ($490.41 and $619.14) totaling $2,971.13; and (3) liability for Joyce Bruno's funeral in the sum of $3,985.00 and for other purchases made through Mastercard in the same month that Joyce Bruno's funeral was held—November 1985—in the sum of $1,700.

Earlier, after its initial review of the file in this case, this court issued its order on June 5, 1986, directing the debtor to show cause in writing within 21 days why these proceedings should not be dismissed under § 707(b) of the Bankruptcy Code, setting out the following relevant considerations:

"It appears from a perusal of the petition, statement of affairs and schedules in this case that the debtor incurred much, if not most of his unsecured indebtedness, within five (5) months of bankruptcy; that some of the indebtedness was incurred in connection with state criminal proceedings at a time and under circumstances which indicate that the debtor knew or should have known that he could not pay the indebtedness; and that, therefore, to grant a general discharge in bankruptcy in this case may be a 'substantial abuse' of the provisions of chapter 7 of the Bankruptcy Code within the meaning of § 707(b) thereof."

In response to that order, the debtor has produced signed statements from his parents and grandparents to the effect that they waive any objections to discharge which they may have, "including an objection under 707(b) of the Bankruptcy Code." The substantial effect of those written "waivers" from the relatives of the debtor is to make this a case in which the debtor seeks to use the bankruptcy court for the purpose of discharging the indebtedness incurred by him as the result of his crime.

This court is aware that there are recent appellate court decisions which hold that a duty imposed by criminal courts to make restitution to victims of crimes constitutes an indebtedness which may be discharged

in bankruptcy.[1] Those decisions, however, turn on interpretation and construction of the wording of the applicable dischargeability statutes, and certainly not upon general principles of equity, justice and "substantial abuse."[2] Even the decisions so holding, accordingly, voice their concern that the bankruptcy courts not become "havens for criminals" and conclude that it is the role of Congress to correct any injustice which their holding may engender.[3]

And there are holdings to the contrary— and to the effect that, in an action to determine dischargeability of an indebtedness under § 523 of the Bankruptcy Code, the duty to make restitution is not an indebtedness which can be discharged in bankruptcy.[4] Further, in the case at bar, the court's determination is not limited by the rather tightly drawn and strictly interpreted dischargeability statutes, but rather is governed by the rather broad duty imposed upon bankruptcy courts by § 707(b) of the Bankruptcy Code *sua sponte* to review the cases filed and determine whether any of them constitutes a "substantial abuse" of chapter 7. Under the considerable authority and the obviously equitable obligation imposed upon the bankruptcy court by that statute, it seems almost certain to have been intended that the bankruptcy courts prevent the use of the Bankruptcy Code to promote injustice in any form.

As an initial consideration in support of this general aphorism, it seems appropriate to observe that the concept of bankruptcy and its premier importance to the economic and political life of our nation appears to

this court to place the laws and rules which implement its key role above and beyond the use of those who would employ them to gain freedom from indebtednesses which were incurred as a result of their crimes. Bankruptcy has too grand and lofty a purpose for such misuse. The framers of our national constitution penned the bankruptcy power into its articles[5] as one of the most significant—if, indeed, not the most significant—of the protections of our way of life. The fundamental and paramount importance of bankruptcy laws can quickly be grasped if one simply contemplates a system in which each citizen was permitted only one economic life and in which any single economic failure would make one a debtor for life, or nearly so, regardless of the potential future benefits to himself and his society which his industry and innovative genius might otherwise have created. Such a legal system would frustrate and still the creative spirit which lies at the heart of our democratic society. On the other hand, however, if the bankruptcy process is permitted to be abused by those whose purposes are not in consonance with this ideal, the effect tends to be the same as if proper use of the bankruptcy laws were wholly suppressed. For the bad reputation of the bankruptcy system which thus develops discourages its use by those who would prefer to preserve some semblance of their good name.

 It is in consequence of these realities that the bankruptcy court has a paramount obligation to prevent such abuses as

---

**1.** See *In re Robinson,* 776 F.2d 30, 37 (2d Cir. 1985) ("Nor are we persuaded by the reasoning in the *Pellegrino* line of cases that because Congress stated that it did not intend the bankruptcy laws to provide a haven for criminals the Code's definition of 'debt' must be read as excluding an obligation to make restitution of unlawfully gained funds.... We conclude that a debt that has compensation for actual pecuniary loss as at least one of its purposes is not, to the extent that it does not exceed the amount of the loss, excepted from discharge by section 523(a)(7)...."). In that case, a concurring opinion expresses "concern at the unfortunate result compelled by the language of the relevant provisions of the Bankruptcy Code" and states a hope "that Congress will remedy this unfortu-

nate loophole by amending 11 U.S.C. section 523(a)(7) to make criminal restitution payments non-dischargeable in bankruptcy."

**2.** See note 1, *supra.*

**3.** See note 1, *supra.*

**4.** See the decisions set out in the text of *In re Robinson,* 776 F.2d 30, 34 (2d Cir.1985).

**5.** "The Congress shall have Power To ... Establish ... uniform laws on the subject of Bankruptcies throughout the United States." Article I, Section 8, Clause 4 of the Constitution of the United States.

will bring the great goals of bankruptcy into disesteem and disrepute. As this court has recently stated in *Matter of Carroll*, 70 B.R. 143 (Bkrtcy.W.D.Mo.1986):

"It is plain and evident from an examination of these fundamental concepts that, in determining the issue of who is entitled to a discharge in bankruptcy, the bankruptcy courts must make one of the most important, critical and sensitive decisions known to American jurisprudence. Fine distinctions must be painstakingly and accurately—yet promptly—perceived. For it is clear that tempering justice with mercy in granting discharge under some circumstances will promote the ideals of giving struggling debtors new economic life; in others—not far removed factually, perhaps, from these situations—it can only stultify and defeat that ideal by leaving it open for those who would practice artifice and deception to abuse the bankruptcy system. And experience teaches that when the permutations of the law promote abuse, the bankruptcy system tends to become a haven for the abusers, for others who might otherwise, in their hour of need, avail themselves of the process refrain from doing so out of shame and fear for their reputation."

The bankruptcy laws should accordingly be protected in this case by a dismissal of the debtor's chapter 7 petition as a "substantial abuse" of the provisions of that chapter.

▪ As a postscript, it must be observed that at least one recent bankruptcy court decision has held that section 707(b) itself should be nullified as a statute which (1) empowers the bankruptcy court to render an advisory opinion and (2) which also denies the debtor due process.[6] The first ground for nullification can be considered valid and effective only if the bankruptcy courts are considered to be Article III courts. For otherwise, as has been not infrequently observed, it is perfectly in keeping with the Constitution and laws of the United States for a non-Article III court to render advisory opinion. See, e.g., *Matter of Transport Clearings-Midwest, Inc.*, 41 B.R. 528, 539 (Bkrtcy.W.D.Mo. 1984), to the effect that "it is only constitutional courts which cannot render advisory opinions. 'A federal court that is not subject to the limitations of Article III may, of course, be required to render an advisory opinion.' 6A Moore's Federal Practice para. 571.12, p. 57–109, n. 2 (1983)." Thus, even in the absence of an actual case or controversy, the bankruptcy court would not be precluded from rendering a final order in this respect. The court is, of course, mindful that the current jurisdictional status of the bankruptcy court causes great doubt as to the appropriate classification of the bankruptcy court among the hierarchy of federal courts.[7] But the annals are too full of reports of decisions of adjudications made wherein the party whose rights were being adjudicated appeared before the court *ex parte* and unopposed for it to be concluded that section 707(b) violates procedural due process.[8] It is only the debtor who stands to lose something on account of the section 707(b) inquiry. And he is permitted to appear personally and by counsel and fully to be heard on the issues defined by the statute.[9]

For the foregoing reasons, it is hereby

6. See, e.g., *In re Keniston*, 60 B.R. 742, 745 (Bkrtcy.D.N.H.1986) ("Is the requisite 'case and controversy' requirement for federal jurisdiction under Article III of the Constitution when no other party *besides the court itself* has raised any issue or dispute requiring judicial determination? .... Does the statute deny procedural due process by constituting the judicial officer who must decide the ultimate question of the debtor's right to bankruptcy relief as in effect 'accuser' or 'prosecutor' initiating the complaint against the debtor?")

7. See, e.g., *Matter of Richardson*, 52 B.R. 527 (Bkrtcy.W.D.Mo.1985).

8. In fact, the obtaining of a discharge in bankruptcy is ordinarily done ex parte under section 524 of the Bankruptcy Code, as is the adjudication in bankruptcy itself.

9. A full opportunity for the debtor to present his factual and legal contentions has been accorded.

ORDERED, ADJUDGED AND DE-CREED that the within chapter 7 case be, and it is hereby, dismissed as a "substantial abuse" of the provisions of that chapter within the meaning of section 707(b) of the Bankruptcy Code.